# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA            )
*EX. REL.* DONALD MINGE, et al.,    )
                                    )
                    Plaintiff,      )      **CIVIL ACTION**
                                    )
v.                                  )      No.  07-1212-MLB
                                    )
TECT AEROSPACE, INC., et al.,       )
                                    )
                    Defendants.     )
_____)

## MEMORANDUM AND ORDER

This case comes before the court on defendants' motions to dismiss, converted to motions for summary judgment. (Docs. 36, 38). The motions have been fully briefed and are ripe for decision. (Docs. 37, 39, 44, 47, 50, 55, 56, 57, 60). Defendants' motions are granted in part and denied in part for the reasons herein.

Relators[1] Donald Minge and David Kiehl are previous employees of TECT Aerospace and TECT Wellington (collectively referred to as TECT) who allege that defendants, TECT and Hawker Beechcraft, falsely represented to the United States that certain airplane parts were manufactured in compliance with the United States' specifications when, in fact, they were not. The Third Amended Complaint (TAC) asserts claims against all defendants under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, brought on behalf of the United States

---

[1] A "relator" is an individual who is allowed to bring a damages action in the government's name against those who allegedly have perpetrated fraud on the government. E.g., United States v. East Alabama Healthcare Auth., 953 F. Supp. 1404, 1407 n.1 (M.D. Ala. 1996).
The government entered a notice of election to decline intervention in this case on March 26, 2009. (Doc. 15).

under the qui tam provisions of § 3730(b)(1).  Plaintiffs also make state law tort claims as to the TECT defendants.

## I.    Facts[2]

Relator Donald Minge was employed at TECT Aerospace from June 2000 through June 15, 2007 as the Quality Assurance Director.  Relator David Kiehl was employed at TECT Wellington from December 2006 through May 8, 2007 as the Engineering Manager.  TECT is an aviation parts manufacturer whose primary business is to subcontract the manufacture of airplane parts for airplane manufacturers.  Defendant Hawker Beechcraft (HBC) contracts with the United States for the sale and production of completed aircraft.

Commencing on January 5, 1996, HBC was awarded a contract for the United States Air Force and United States Navy's Joint Primary Aircraft Training System program (JPATS).  The JPATS program developed a T-6A (Texan), a single-engine, turboprop training aircraft.  The JPATS contract calls for 768 Texans to be delivered by early 2016. HBC has also contracted with the United States for the King Air Program which provides for the purchase of King Air aircraft, including the C-12 and the Beech King Air 350.[3]

---

[2] Additional facts will be cited throughout the analysis when necessary.  The facts set forth by relators in their response are only considered in establishing the extent of the public disclosure and the time line.  The court has not considered the merits of the claim in determining whether it has jurisdiction.  Therefore, HBC's motion to strike the facts provided in relators' supplemental response is moot. (Doc. 61).

[3] A large number of contracts have been awarded over the ensuing years.  (Doc. 18 at 11-20).  Many of the contracts were with Raytheon Aircraft Company.  Raytheon is now Hawker Beechcraft Corporation (HBC).  Therefore, the court will address the two companies as HBC throughout the opinion.

In the contracts for JPATS and King Air, HBC is required to perform according to certain drawings and specifications. HBC is also required to provide those specifications to its contractors, including TECT. In accordance with its agreement with HBC, TECT was to manufacture the wing spars for the JPATS and King Air contracts. A spar is the main longitudinal beam of the airplane's wings. The wing spars bear a significant load when the airplane is in flight and therefore are designated "critical" or "fracture critical" in the design specifications. A "fracture critical" part is one whose loss would compromise the safety of flight.

In September 2006, Minge was asked by TECT officials to investigate why HBC had rejected approximately sixteen JPATS spars. The spars were rejected for reasons which included: wavy and twisty conditions, dished areas and the spar flange had tapered conditions at various locations. Minge believed that the parts were being reworked by grinding and hand forming which were not acceptable manufacturing processes. Minge attended several meetings about the spars and reported his findings to TECT and HBC.

Kiehl learned about Minge's investigation shortly after he began his employment with TECT. On April 17, 2007, Kiehl attended a meeting to discuss the rework process for the spars. At the meeting, Kenny McEntire, the supervisor of the form shop, stated that the spars were being reworked with a sledgehammer. Kiehl expressed concern over the process and was told that the shop had always done it that way. Later that evening, Minge called Kiehl to tell him what he had learned. Over the next several days, Kiehl worked with Minge to confirm the process used on the spars. Kiehl asked employees on all shifts how

they reworked the spars. The employees stated that pry bars and sometimes hammers were used to form the parts so that they would fit into the check fixture. On one occasion, Kiehl heard a loud banging noise and saw an employee hitting King Air spars with a hammer.

Minge questioned one of the operators, Robert Higginbotham, about his process in reworking the spars. Higginbotham performed a mock demonstration in which he said he would take a part off of the rack, take it to a table and place it on blocks. Higginbotham then said they would take a non-metallic aluminum hammer and "commence to bashin' the part." (Minge Decl. at ¶ 41). Minge then took pictures of a part that was on the block and had visible signs of round hammer marks. Minge and Kiehl determined that all parts in the shop should be red tagged and placed on an Engineering Hold until they could get guidance from HBC Engineering. Minge and Kiehl reviewed the Job Traveler for the King Air spars which stated that the employee was to "Bench as Required" and then "Blend benching marks as required." (TAC ¶ 189). Minge and Kiehl were very concerned about the potential ramifications of the reworking process.

Minge and Kiehl expressed their concerns to management at TECT. On May 3, 2007, HBC employees arrived at TECT to review the rework process for the spars. Minge and Kiehl asked the HBC employees to review the King Air -127 spars that were on Engineering hold. They agreed but said that they would need to contact the appropriate HBC King Air Process Engineers with the information. The HBC employees asked how the wrinkles were removed on the parts. Kiehl said the parts were "benched" but did not give specifics. The HBC employees were concerned that the process could affect the entire King Air

fleet.

After the visit with HBC, Kiehl attended a two hour sales meeting. Kiehl was then suspended by Chuck Gumbert, TECT Wellington's General Manager, for allegedly falling asleep during the meeting. On May 4, Rick McGee contacted Minge and asked him if the -127 spars could ship. Minge said no because there was an agreement that they would not ship until TECT was contacted by HBC engineers about the parts. Gumbert then contacted David Roll and said that the parts were going to be shipped that day.

Minge visited Gumbert's office the next day. Gumbert said that he was going to miss his "dollars this week" due to Minge's actions. (Minge Decl. at ¶ 61). Minge told him that the parts could ship after he had heard form HBC Engineering. A few minutes later, Minge was motioned to enter the office of Denise Fox, the TECT program manager, who was present with Gumbert and on a conference call with George Voorhees. Voorhees asked Minge about the parts not shipping. Minge stated that he was waiting for engineering, but could ship the parts with full disclosure to HBC of everything that had occurred. Voorhees said "Oh F--K no we don't want to do that." (Minge Decl. ¶ 62).

On May 7, a telephone conference with HBC occurred in which it was determined that the parts would be shipped on variance requests. HBC was to provide TECT with authorization to hot form and provide a process to remove the wrinkles from the parts. After the call, Minge told the TECT employees that he felt he was bound to disclose everything that occurred. Minge told Gary Giles, TECT plant manager, that he would need all the hot forming temperature records so that HBC could review them.

On May 9, 2007, TECT filed a lawsuit in the district court of Sumner County, Kansas, and obtained a Temporary Restraining Order and Temporary Injunction against Kiehl which prohibited him from disclosing to anyone what he knew about TECT's "operations, activities or business." (Kiehl Decl. at ¶ 28). On May 15, there was an unannounced visit by HBC at TECT. The HBC employees interviewed TECT employees regarding the spars. Contrary to what was allegedly told to Kiehl and Minge, the employees stated that the spars were placed on the table, a block was placed directly on the part and the block was hammered on in order to remove the wrinkles. All employees gave the same description of the process, including Higginbotham.

On May 19, Linda Coleman, TECT Wellington HR Director, called Minge and told him that there was an issue with Kiehl and instructed Minge not to speak with Kiehl. On May 29, Kiehl filed a memorandum in opposition to plaintiff's motion for a temporary injunction. The memorandum stated that TECT employees had been using unapproved manufacturing methods and that those parts were then shipped to HBC. On June 1, Minge discussed the HBC audit report with Kiehl and gave him a copy of the report. Kiehl was then terminated on June 15 for sharing information with Minge.

On July 10, 2007, Minge and Kiehl met with Laurie Kahrs, an Assistant United States Attorney, and Dean Smyth, a DCIS Investigator. One week prior to the meeting, Kiehl sent the following documents to DCIS: "1) hard copies of all communications between Minge and Kiehl; 2) copies of e-mails with HBC concerning the discovery of the 'wrinkling' or 'impact forming' issue, the HBC 'audit report,' and documents concerning the attempts to modify processes; and 3) a

-6-

chronology of 'conversations and events that pertain to the HBC visit on May 3 and the HBC audit activity.'"  (Kiehl Decl. ¶ 83).

On July 27, 2007, Minge and Kiehl filed a complaint against TECT which was amended on August 3. On May 15, 2008, Minge and Kiehl filed a second amended complaint adding HBC.  On April 13, 2009, the third amended complaint was filed.

Defendants initially moved to dismiss the complaint on the basis that this court lacks jurisdiction of relators' qui tam claims. Alternatively, defendants assert that relators failed to allege the claim with particularity as required by Fed. R. Civ. P. 9(b).  TECT further moves for dismissal of the state law claims against it on the basis that they fail to state a claim.  The court converted the motions to summary judgment.[4]

## II.  Summary Judgment Standards

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here.  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is

---

[4] The motions were originally filed as Rule 12(b) motions to dismiss.  Both defendants and relators attached exhibits to their memoranda.  The court notified the parties that it was converting the motions to Rule 56 motions unless the parties objected.  (Doc. 51). Defendants did not object but stubbornly maintain that their motions are appropriate under Rule 12(b) because they are challenging this court's jurisdiction.  As stated in the letter, the Tenth Circuit in United States ex rel. Fine v. MK-Ferguson Co., 99 F.3d 1538, 1543 (10th Cir. 1996), held that it was proper to convert a motion to dismiss in a qui tam case involving a subject matter question such as this one.  Because all parties attached exhibits to their memoranda, including declarations from relators, the court continues to believe that conversion of the motions is the best course of action which, in any event, has not prejudiced defendants.

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).
An issue is "genuine" if sufficient evidence exists so that a rational
trier of fact could resolve the issue either way and an issue is
"material" if under the substantive law it is essential to the proper
disposition of the claim. <u>Adamson v. Multi Community Diversified
Svcs., Inc.</u>, 514 F.3d 1136, 1145 (10th Cir. 2008). When confronted
with a fully briefed motion for summary judgment, the court must
ultimately determine "whether there is the need for a trial—whether,
in other words, there are any genuine factual issues that properly can
be resolved only by a finder of fact because they may reasonably be
resolved in favor of either party." <u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242, 250 (1986). If so, the court cannot grant summary
judgment. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

## III. Analysis

### A. Subject Matter Jurisdiction over FCA Claims

Federal courts are courts of limited jurisdiction. The party
seeking the federal forum must establish the basis for the court's
jurisdiction. <u>United States ex rel. Precision Co. v. Koch Indus.,
Inc.</u>, 971 F.2d 548, 551 (10th Cir. 1992). United States district
courts have original jurisdiction over actions arising under the laws
of the United States. 28 U.S.C. § 1331. Under 31 U.S.C. §
3730(b)(1), Congress provided for federal court jurisdiction in civil
qui tam actions brought by private citizens on behalf of the United
States to recover from persons who have made false or fraudulent
claims against the government.

The Act denies a court jurisdiction over a qui tam action "based
upon the public disclosure of allegations or transactions in a . . .

-8-

civil, . . . hearing, . . . , unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). The Act does not expressly define "public disclosure." The Act does define "original source" to mean "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B).

> The jurisdictional inquiry under 31 U.S.C. § 3730(e)(4)(A) & (B) requires a four-step analysis (1) whether the alleged "public disclosure" contains allegations or transactions from one of the listed sources; (2) whether the alleged disclosure has been made "public" within the meaning of the False Claims Act; (3) whether the relator's complaint is "based upon" this public disclosure; and, if so, (4) whether the relator qualifies as an "original source."
>
> * * *
>
> The point of the public disclosure test is to determine whether the qui tam lawsuit is a parasitic one. A court should address the first three public disclosure issues first. Consideration of the fourth, 'original source' issue is necessary only if the court answers the first three questions in the affirmative.

U.S. ex rel. Grynberg v. Praxair, Inc., 389 F.3d 1038, 1048-49 (10th Cir. 2004)(internal citations omitted).

**1. Public Disclosure**

The first step, the public disclosure, was Kiehl's filing in the Sumner County case, which qualifies as a listed source. Section 3730(e)(4) lists "[(1)] a criminal, civil, or administrative hearing, [(2)] a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, [or (3)] the news media" as sources available for public disclosure.

As to the second step, the court finds, and relators do not dispute, that Kiehl's filing amounted to public disclosure within the meaning of the FCA.  Kennard v. Comstock Resources, Inc., 363 F.3d 1039, 1042-1043 (10th Cir. 2004)("any information disclosed through civil litigation and on file with the clerk's office should be considered a public disclosure").

Turning to the third step, relators argue that the disclosure did not reveal and was not "based upon" the fraudulent allegations set forth in the TAC.  (Doc. 44 at 11).  The TAC spans over 100 pages and provides far more detailed account of the allegedly fraudulent transactions as compared to Kiehl's filing in the state case, which speaks to the reworking of the King Air wing spars, that those methods were not approved and that the spars revealed stress levels above the allowed limits.

Relators cite U.S. ex rel. Fine v. Sandia Corp., 70 F.3d 568, 571 (10th Cir. 1995) for the position that the "core elements of the fraud must be disclosed before the bar applies." (Doc. 44 at 11).  Fine, however, does not stand for that proposition.  In Fine, the relator asserted that his disclosure was not a public disclosure because it "did not contain the allegations or transactions upon which his complaint is based."  70 F.3d at 571.  The Tenth Circuit ultimately held that "Section 3730(e)(4)(A) merely requires the public disclosure of 'allegations or transactions' upon which the qui tam action is based. It does not require that the allegations have the same statutory basis."  Id.  Moreover, the Tenth Circuit has instructed that "a reviewing court should not evaluate the quality and quantity of information in the public domain as part of its

jurisdictional inquiry." U.S. ex rel. Fine[5] v. Advanced Sciences, Inc., 99 F.3d 1000, 1005 (10th Cir. 1996).

The third step requires a determination of whether the qui tam action is "based in any part upon" on Kiehl's filing. U.S. ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 553 (10th Cir. 1992). The term "based upon" in 31 U.S.C. § 3730(e)(4)(A) means "supported by." Id. at 552. In viewing the allegations, the court is instructed to determine whether "substantial identity" exists between the state filing and the TAC. Id. at 553. The Tenth Circuit has further instructed that the public disclosure exception bars any action that is even partly based upon the public disclosure. Id. at 552.

The TAC is entirely based upon Kiehl's Sumner County filing, albeit in a substantially amplified form. Stated another way, the Sumner County filing is a short synopsis of the alleged fraud that is more specifically set forth in the TAC. Kiehl's Sumner County filing discusses the reworking of the King Air wing spars with unapproved means while the TAC goes into the history of the allegations and the contracts entered into with the government. The court finds that the TAC is sufficiently based upon the public disclosure in the Sumner County filing and is sufficient to put the government on notice of the alleged practices of TECT and HBC.[6]

_____

[5] As a point of interest only, Relator Fine in Advanced Sciences is the same Fine in MK-Ferguson and Sandia Corp. The motion to dismiss in Advanced Sciences was also converted.

[6] For example, the Sumner County filing states, in part:
"The next day Kiehl learned that Gumbert had ordered the King Air wing spars that had been hammered by TECT employees to be shipped to Hawker Beechcraft, despite the engineering hold that Kiehl had placed

Relators also urge the court to find that there was no public disclosure because Kiehl was faced with a Catch-22 - respond to the state court's issuance of a temporary restraining order or challenge the order. It is clear from the nature of the filing that Kiehl was not required to file the memorandum which divulged the information that formed the basis for the qui tam action. Arguably, although not appealing to Kiehl, Kiehl could have complied with the temporary restraining order until the conclusion of the case. While Kiehl apparently felt that he needed to disclose the information to challenge the order, Kiehl has not provided the court with any authority for an exception to the public disclosure bar in this instance. The statutory authority is clear in that the only questions before the court are whether the disclosure was public and if the TAC is based on the disclosure. Therefore, relators must be an original source or this court does not have subject matter jurisdiction over the TAC.

## 2. Original Source

The fourth step is whether relators are an "original source," i.e. whether they have "direct and independent knowledge of the information on which the allegations are based" and have "voluntarily provided the information to the Government" prior to filing suit. §3730(e)(4)(B). "Direct knowledge is knowledge gained by the relator's own efforts and not acquired from the labors of others." <u>U.S. ex rel.</u>

---

on the wing spars. Kiehl became concerned that Gumbert would knowingly ship suspect aircraft parts that had been quarantined, and he informed Hawker Beechcraft directly of the problem. Kiehl was assured by Hawker Beechcraft that any parts received would be quarantined."

_Grynberg v. Praxair, Inc._, 389 F.3d 1038, 1052 (10th Cir. 2004)(citing _United States ex rel. Fine v. MK-Ferguson Co._, 99 F.3d 1538, 1548-49 (10th Cir. 1996). Defendants first argue that relators are not an original source because they failed to provide the information to the government before the public disclosure. HBC additionally argues that relators are not an original source as to the allegations against HBC because they did not assert allegations against it prior to the Second Amended Complaint which added HBC as a defendant.

Turning to defendants' first argument, the appellate courts are split on the issue of whether an original source must disclose the information to the government prior to the public disclosure, here Kiehl's filing in the Sumner County lawsuit. The statutory language does not contemplate this requirement. Rather, it requires that an original source must provide the information to the government prior to filing a qui tam action. §3730(e)(4)(B). The Sumner County case was not filed by either relator and, in any event, it was not a qui tam action. The Tenth Circuit has yet to decide this issue. In _U.S. ex rel. King v. Hillcrest Health Center, Inc._, 264 F.3d 1271, 1281 (10th Cir. 2001), the court declined to decide the issue because it found that the relator had failed to provide sufficient notice to the government prior to filing suit.

To support their position, defendants cite two District of Kansas cases which conclude that the Tenth Circuit would ultimately decide that an original source must disclose the information to the government prior to the public disclosure. In _U.S. ex rel. Hafter v._ _Spectrum Emergency Care, Inc._, 9 F. Supp.2d 1273 (D. Kan. 1998) and _U.S. ex rel. Eaton v. Kansas Health Care Investors_, 22 F. Supp.2d 1230

(D. Kan. 1998), Judges Marten and Brown held that the Tenth Circuit would likely adopt the Sixth and D.C. Circuit's rulings that an original source must provide the government with the information prior to any public disclosure.[7]  At the time of Judges Marten and Brown's decisions, only those two circuits had been directly confronted with the issue.  Since those rulings, however, three additional circuits have dealt with the issue and have disagreed with defendants' position.

In <u>U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.</u>, 579 F.3d 13, 22 (1st Cir. 2009), the most recent case to address this issue, the First Circuit began by reviewing the statutory language.

> Although we are about to travel a well-trodden path, our first step remains the same. "Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 340, 117 S. Ct.

---

[7] In <u>U.S. ex rel. Findley v. FPC-Boron Employees' Club</u>, 105 F.3d 675, 691 (D.C. Cir. 1997), the court reasoned that a relator must first disclose the information to the government before public disclosure because there would be little need for the incentive provided by a qui tam action after a public disclosure.  The court then concluded that the only reasonable reading of the statute is one that "requires an original source to provide the information to the government prior to any public disclosure."  <u>Id.</u>

In <u>U.S. ex rel. McKenzie v. Bellsouth Telecommunications, Inc.</u>, 123 F.3d 935 (6th Cir. 1997), <u>cert. denied</u>, 522 U.S. 1077, 118 S.Ct. 855, 139 L.Ed.2d 755 (1998), the Sixth Circuit agreed with the District of Columbia Circuit and reasoned that an original source could not "be a 'true whistleblower' unless [he] is responsible for alerting the government to the alleged fraud before such information is in the public domain.  . . . [T]o be an original source, a relator must inform the government of the alleged fraud before the information has been publicly disclosed."

In <u>McKenzie</u>, the Sixth Circuit discussed the other approaches of the different courts of appeals.  The Sixth Circuit recognized that the Tenth Circuit follows the majority of the circuits and merely requires direct and independent knowledge of the allegations.  <u>Id.</u> at 942.  At that time, however, the Tenth Circuit was not faced with the issue of timing of the disclosure.

843, 136 L. Ed.2d 808 (1997). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." <u>Id.</u> at 341, 117 S. Ct. 843.

By its terms, the "original source" exception only requires the relator to "provide[ ] the information to the Government before filing an action under this section which is based on the information." 31 U.S.C. § 3730(e)(4)(B). <u>Section 3730(e)(4)(B) does not impose any other timing requirement.</u> Nor does § 3730(e)(4)(A). Thus, like the Fourth Circuit and the district court below, we conclude that the plain terms of § 3730(e)(4)(B) begin and end the matter. <u>See</u> <u>Robinson</u>, 519 U.S. at 340, 117 S. Ct. 843 ("Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" (quoting <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235, 240, 109 S. Ct. 1026, 103 L. Ed.2d 290 (1989)).

579 F.3d at 22 (emphasis supplied).

The Ninth, Eighth and Fourth Circuits all have came to the same conclusion as the First Circuit after a review of the statutory language: <u>United States v. Johnson Controls, Inc.</u>, 457 F.3d 1009, 1015 (9th Cir. 2006)("the language of subsection (B) is not compatible with any requirement that the information disclosure occur before some event other than the one stated, the time of "filing an action.");

<u>Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.</u>, 276 F.3d 1032, 1050-51 (8th Cir. 2002)("This additional requirement [of disclosure to the government prior to public disclosure] has no textual basis in the statute."); <u>U.S. ex rel. Siller v. Becton Dickinson & Co. By and Through Microbiology Sys. Div.</u>, 21 F.3d 1339, 1355 (4th Cir. 1994)(an original source "need only provide his information to the government before instituting his qui tam action, as the provision unambiguously states.")

While the court has respectfully considered the opinions of

Judges Marten and Brown, this court believes that the Tenth Circuit would hold today that the language of the statute unambiguously requires the disclosure to the government occur only prior to filing the qui tam suit. This conclusion is buttressed by <u>U.S ex rel. Precision Co v. Koch Industries</u>, <u>supra</u>. In <u>Precision</u>, the relator asked the court to rule that the "based upon" requirement of the statute applied only to qui tam actions. The Tenth Circuit declined to "insert the adverb solely . . . because to do so would dramatically alter the statute's plain meaning." The court stressed that it was "governed by the plain language of the statute." 971 F.2d at 552. It seems unlikely that the Tenth Circuit would read a "prior to public disclosure" requirement into the statutory language.

Thus, the question boils down to whether Kiehl and Minge are an "original source" as defined in 31 U.S.C. § 3730(e)(4)(B). In their declarations, Minge and Kiehl state that they had several documents in their possession at the time of their disclosure to the government that implicated both HBC and TECT in fraudulent activities. (Minge Decl. ¶ 86; Kiehl Decl. ¶ 37). Minge and Kiehl further state that they made further deductions after reviewing documents that were subpoenaed. (Minge Decl. ¶¶ 86-87; Kiehl Decl. ¶ 37).

HBC does not refute relators' declarations with evidence. Instead, in its second argument HBC asserts that relators are not an original source because they did not name HBC in the initial and amended complaints.[8]  HBC cites five cases to support its position.

_____

[8] TECT makes no independent argument on this point. Instead, it merely adopts the positions put forth by HBC. (Docs. 39 at 9; 56 at 4-5).

In <u>U.S. ex rel. Smith v. Yale Univ.</u>, 415 F. Supp.2d 58, 75 (D. Conn. 2006), the court found that the relator was not an original source to certain allegations in the amended complaint. Unlike HBC's inference, the court did not bar the allegations because the relator did not include them in the original complaint. Rather, the court found that the relator had obtained that information from disclosure in a state court action. Therefore, the documents the relator relied on in the second amended complaint were publicly disclosed and the relator could not be considered an original source of those documents without independent knowledge. This case is different. Relators state that they had independent knowledge at the time of the complaint and that they received additional documentation pursuant to subpoenas issued by the government. Contrary to <u>Smith</u>, there is no evidence that the documents reviewed by relators were considered public disclosures.

Similar to <u>Smith</u>, the issue in the second case cited by HBC was whether the relator had independent knowledge of the allegations in the amended complaint or if that knowledge was from a public disclosure. <u>U.S. ex rel. Ackley v. Int'l Bus. Machines Corp.</u>, 76 F. Supp.2d 654, 660 (D. Md. 1999). HBC has not asserted that relators derived their information from a public disclosure. HBC evidently wants the court to infer that relators must not have received that information first hand because it was not in the original complaint. HBC points to no other source of the information, however.

The third case cited by HBC is <u>U.S. ex rel. Kinney v. Stoltz</u>, which HBC stands for the "legal presumption" that a relator is not an original source if he does not name a defendant in the original complaint. (Doc. 55 at 18). <u>Kinney</u> is a Rule 9(b) case. The words

"legal presumption" appear nowhere in the opinion.

The fourth case is <u>U.S. v. Seal 1 v. Seal A</u>, 255 F.3d 1154 (9th Cir. 2001), which HBC cites for the same "legal presumption" assertion. As before, the words "legal presumption" do not appear in the opinion. The issue was whether a relator is the original source of information disclosed in an investigation triggered by initial disclosures. The opinion describes a four-part test, which HBC makes no attempt to discuss.

The fifth case is <u>Kokkomen v. Guardian Life Ins. Co. of Am.</u>, 114 U.S. 375, 128 L. Ed.2d 391, 114 S. Ct. 1673 (1994). About all that can be said for HBC's reliance on this case is that the word "presumed" appears in the opinion ("It is to be presumed that a cause lies outside this limited jurisdiction," referring to the general proposition that federal courts are courts of limited jurisdiction). But <u>Kokkomen</u> is not a qui tam case. It isn't even a Rule 9(b) case. It is not pertinent and should not have been cited.

Minge and Kiehl's declarations state that they personally reviewed documents to make their own conclusions about alleged fraudulent activity. The court therefore concludes that relators are original sources as to all allegations in the third amended complaint. <u>U.S. ex rel. Barajas v. Northrop Corp.</u>, 5 F.3d 407, 411 (9th Cir. 1993)("[e]vidence publicly disclosed for the first time during the discovery phase of a qui tam suit is not barred from use in that same suit by section 3730(e)(4)(A).")

Defendants' motion for summary judgment due to lack of subject matter jurisdiction is denied.

**B.  Rule 9(b)**

In the alternative, defendants assert that counts one through three must be dismissed for failure to comply with Fed. R. Civ. P. 9(b), which provides, "[i]n all averments of fraud or mistake the circumstances constituting the fraud or mistake shall be stated with particularity." The requirement in Rule 9(b) applies to qui tam actions. To survive a motion to dismiss which relies upon Rule 9(b), the complaint must set forth the "who, what, when, where and how of the alleged fraud . . . and . . . the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 726-27 (10th Cir. 2006).

The TAC is over 100 pages long. The allegations include specific citations to federal regulations and several allegations that defendants entered into contracts with the government. The complaint, however, fails to specify whether any planes were equipped with the allegedly defective parts and, if so, which parts and which planes. It also fails to plead any allegations of false claims for payment. Relators simply claim that all planes were equipped with defective parts because Kenny McIntire, the shop supervisor, stated that they had always "done it that way." (TAC ¶ 182). Relators further argue that they have satisfied the "what" of the fraud because "defendants' [sic] repeatedly stated that the specific crucial spar parts manufactured by TECT and installed by HBC . . . were manufactured in compliance with contractual specifications." (Doc. 44 at 30). Relators then cite to paragraphs 67 through 103 of the TAC which state in detail the regulations concerning statements about parts and also

quote from the Department of Defense Handbook and HBC's Supplier Quality Requirements. But absent are any allegations of "when" a false statement was made to the government and the content of that statement. Also absent are any allegations of knowledge that a defective part was placed on a specific plane and then sold to the government.

Relators argue that they should be allowed to proceed on their claims even in the absence of specific allegations regarding representations and claims because defendants have the exclusive control over that knowledge. The Tenth Circuit, however, has held differently.

> [A] relator must provide details that identify particular false claims for payment that were submitted to the government. In a case such as this, details concerning the dates of the claims, the content of the forms or the bills submitted, their identification numbers, the amount of money charged to the government, the particular goods and services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices are the types of information that may help a relator to state his or her claims with particularity. These details do not constitute a checklist of mandatory requirements that must be satisfied for each allegation included in a complaint. However, like the Eleventh Circuit, we believe that 'some of this information, for at least some of the claims must be pleaded in order to satisfy Rule 9(b).'

Sikkenga, 472 F.3d at 727-28 (quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 232-33 (1st Cir. 2004)).

In Sikkenga, the relator's claims were based on an alleged fraudulent submission under the defendant's medicare contract with the government. The relator, however, did not allege any specific claims of false payment. The relator insisted that "her failure to comply

with Rule 9(b) should be excused however, because the information is exclusively in the control of Regence, and contends that '[b]y attaching a copy of the Contract and alleging fraudulent inducement [and] how Regence would have subsequently been paid under the contract,' she has 'sufficiently alleged that Regence submitted false claims for administrative costs to the government.'" Id. at 727. The Tenth Circuit disagreed:

> Liability under the FCA requires a false claim—a 'defendant's presentation of a false or fraudulent claim to the government is a central element of every False Claims Act case.' United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 232 (1st Cir. 2004); see also United States ex rel. Clausen v. Lab. Corp. of Am., 290 F.3d 1301, 1311 (11th Cir. 2002); Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 785 (4th Cir. 1999). 'Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the 'circumstances constituting fraud and mistake' that must be pled with particularity under Rule 9(b).' Karvelas, 360 F.3d at 232. However, unless such pleadings are 'linked to allegations, stated with particularity, of the actual false claims submitted to the government,' id., they do not meet the particularity requirements of Rule 9(b).

Sikkenga, 472 F.3d at 727.

Here, the TAC is replete with the general background details about circumstances constituting fraud, i.e. the alleged violations of several government contracts concerning the manufacturing of the wing spars. Absent, however, is any link to an actual false claim submitted to the government. Also absent is any direct allegation that a specific non-conforming spar was placed on a plane sold to the government. Moreover, there are no specific allegations concerning fraudulent activity prior to relators' discovery in the spring of 2007 of non-conforming parts and, subsequent to that discovery, there are no allegations that those parts were in fact put on planes sold to the

-21-

government.

Relators' position set forth in their memoranda would have the court pile inference upon inference in order to satisfy the elements of the FCA. First, the court would have to infer, based on the allegations that certain employees stated that the parts were "always" hand-formed, that every part shipped to HBC was made in violation of the contracts. Second, the court must then infer that all of the planes, or at least one, was fitted with a hand-formed part. Third, the court must infer that those planes, or at least one, were delivered at some point in time to the government. Fourth, the court must then infer that HBC billed the government for a specific plane that was fitted with a hand-formed part. Fifth, the court must make another inference that HBC made some sort of false declaration in the bill for payment that the plane was manufactured in accordance with the specifications set forth in the contract at the time of delivery. While the court is sympathetic with relators' positions and understanding that relators are not privy to all information required by the statute, the court cannot find that these allegations and inferences meet the strict standards of the FCA and Rule 9(b).

The court finds that relators have failed to state the claims with sufficient particularity and have also failed to allege that any false claim was made and paid by the government. <u>Sikkenga</u>, 472 F.3d at 727. Therefore, defendants motion for summary judgment on claims one through three of the TAC is granted.

**C. Retaliation Claim**

In claim four, relators allege that TECT terminated their respective employments in violation of 31 U.S.C. § 3730(h). Section

3730(h) states as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

TECT responds that relators have failed to sufficiently demonstrate that their actions while employed at TECT were done in furtherance of a qui tam investigation. Again, in <u>Sikkenga</u>, the Tenth Circuit held that "plaintiff has the burden of pleading facts which would demonstrate that defendants had been put on notice that plaintiff was either taking action in furtherance of a qui tam action or assisting in an FCA action brought by the government."  472 F.3d at 729.

After reviewing the TAC and the facts set forth in both Minge and Kiehl's declarations, the court finds that there are sufficient facts which would put TECT on notice that relators were acting in furtherance of a qui tam action.  TECT claims that relators had an additional burden of proving notice to TECT because their positions at TECT involved investigating quality control issues.  While the Tenth Circuit has held that "where employees' regular duties include investigation of fraud, such persons must clearly plead notice to their employers of their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations," there is no evidence of relators' job duties with respect to engineering issues

before the court.    472 F.3d at 729.

The TAC and declarations contemplate that relators were tasked with an investigation; however, relators actions involved more than that investigation.  In fact, relators disclosed to HBC personnel the alleged illegal rework process of the spars.  Relators also sought records of the hot forming process on all spar parts, stated that they were going to fully disclose the process to HBC and the FAA and then they admittedly shared documents.  That conduct is sufficient to put TECT on notice that relators were contemplating disclosure to the government.

TECT's motion for summary judgment on relators' FCA retaliation claim is denied.

### D.  State Retaliatory Discharge Claim

TECT moves for summary judgment on relators' state law claim for retaliatory discharge on the basis that relators have a remedy under federal law.  A state law retaliatory discharge claim is precluded if relators have an adequate remedy under federal law.  Conner v. Shnuck Markets, Inc., 121 F.3d 1390, 1399 (10th Cir. 1997).  Relators respond that the state claim is available in the event that their actions are not protected under the FCA.  Relators have not provided any additional argument regarding the inadequacy of the federal remedy.  Because this court has determined that relators have stated an FCA claim for retaliation, their state claim for retaliation must be dismissed.

### E.  Outrage Claim

Finally, TECT moves for summary judgment on Kiehl's claim of intentional infliction of emotional dismiss.  In order to recover on

a claim for emotional distress, Kiehl must prove: (1) intentional conduct; (2) the conduct must be extreme and outrageous; (3) a causal connection between TECT's conduct and Kiehl's mental distress; and (4) Kiehl's mental distress must be extreme and severe. <u>Moore v. State Bank of Burden</u>, 240 Kan. 382, 388, 729 P.2d 1205 (1986), <u>cert. denied</u>, 482 U.S. 906 (1987). "The threshold inquiries for the tort of outrage are whether (1) the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery and (2) the emotional distress suffered by the plaintiff is so extreme the law must intervene because no reasonable person would be expected to endure it." <u>Bolden v. PRC Inc.</u>, 43 F.3d 545, 553 (10th Cir. 1994). Conduct is sufficient to satisfy this test when it is so outrageous and extreme in degree "as to go beyond the bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." <u>Fusaro v. First Family Mortgage Corp.</u>, 257 Kan. 794, 805, 897 P.2d 123 (1995). Kansas courts have repeatedly stated that liability may be found when "the recitation of the facts to an average citizen would arouse resentment against the actor and lead that citizen to spontaneously exclaim, 'Outrageous!'" <u>Id.</u>

Even when viewed in his favor, the court cannot find that the facts recounted by Kiehl, even if true, are atrocious and utterly intolerable. Kiehl must point to facts in the TAC that meet the test for outrage. The TAC makes only one conclusory statement regarding extreme mental distress. Kiehl's declaration does not support any inference of mental distress nor does Kiehl's response aver the extent of the distress but merely argues that it is not necessary to establish the mental distress at this time. Kansas courts have set

a "very high standard" and Kiehl has failed to meet the threshold test. Briggs v. Aldi, Inc., 218 F. Supp. 2d 1260, 1263 (D. Kan. 2002).

TECT's motion for summary judgment regarding Kiehl's outrage claim is granted.

## IV.  Conclusion

Defendants' motions for summary judgment are granted in part and denied in part. (Docs. 36, 38). Defendants' motions for summary judgment on counts one through three are granted on the basis that they fail to comply with Rule 9(b). TECT's motion for summary judgment on relators' retaliation claim is denied. TECT's motion for summary judgment on the state law retaliatory discharge claim and outrage claim is granted. The case is returned to the assigned U.S. Magistrate Judge for appropriate discovery practice.

A motion for reconsideration of this order pursuant to this court's Rule 7.3 is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).

Any such motion shall not exceed five pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp.

The response to any motion for reconsideration shall not exceed five pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this __3rd__ day of February 2010, at Wichita, Kansas.

s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE